## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **WILLIAM DILLARD** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **C.A. NO.:  1:18-cv-4129** |
| **v.** | ) | |
| | ) | |
| **GENERAL MOTORS, LLC** | ) | **JURY TRIAL DEMANDED** |
| **Serve At:** | ) | |
| **300 Renaissance Center** | ) | |
| **Detroit, MI 48265** | ) | |
| **Defendant.** | ) | |

## COMPLAINT

COMES NOW Plaintiff, William Dillard, by and through undersigned counsel, and asserts the following causes of action against Defendant General Motors LLC ("New GM"):

## PARTIES

1.     Plaintiff William Dillard was a citizen and resident Hancock County, Mississippi. On or about May 9, 2015, Plaintiff was driving a 2009 Chevrolet Cobalt VIN 1G1AT58H397159787 ("Subject Vehicle") which was involved in a serious motor vehicle accident in Waveland, Mississippi.

2.     Defendant General Motors LLC ("New GM") is a limited liability company organized and existing under the laws of the State of Delaware. The sole member and owner of Defendant GM is General Motors Holding LLC, a limited liability company also organized and existing under the laws of the State of Delaware. The sole member and owner of General Motors Holding LLC is General Motors Company, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Detroit, Michigan; therefore, General Motors Company, General Motors Holding LLC and General Motors LLC are citizens of

1

Delaware and Michigan. General Motors Company was incorporated in 2009 and, effective July 10, 2009, it acquired substantially all assets and assumed certain liabilities of General Motors Corporation ("Old GM").

## DEFENDANT GENERAL MOTORS' MASTER SALES AND PURCHASE AGREEMENT

3.      New GM acquired the assets of Old GM. New GM continued Old GM's business by employing its management and personnel, acquiring all of its non-real property assets, using Old GM's trade name, and providing the same services to Old GM's customers.

4.      As a result, there was a transfer of assets between New GM and Old GM and New GM expressly and impliedly agreed to assume Old GM's liabilities, the transfer amounted to a consolidation or merger of New GM and Old GM and New GM is a mere continuation of Old GM.

5.      As a result of Old GM's acquisition of July 9, 2009, New GM is liable for all of Old GM's liabilities as a successor corporation.

6.      In June of 2009, Old GM filed for bankruptcy. On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets pursuant to a Master Sales and Purchase Agreement ("Agreement"). The Agreement became effective on July 10, 2009. The Agreement approved the sale of Old GM to Defendant New GM.

7.      The Agreement defines Defendant's "Purchased Assets" as:

> (xiv) all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

(xv) all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . .

AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT at

Section 2.2.

8.    Along with the Purchased Assets, New GM also expressly took on a range of

liabilities. "Liabilities" is defined in the Agreement as "any and all liabilities and obligations of

every kind and description whatsoever, whether such liabilities or obligations are known or

unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent,

determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due,

including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

9.    Among many others, the Liabilities assumed by New GM under the Agreement

include:

(vii) (A) all Liabilities arising under express written warranties of Sellers [i.e., old GM] that are specifically identified as warranties and delivered in connection with sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser [i.e., new GM] prior to or after the Closing and (B) all obligations under Lemon Laws; . . .

(ix) all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents, or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance; . . .

(xi) all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing; . . .

10.    New GM also assumed responsibility for compliance with a wide range of laws and other regulations, including:

(a)    From and after the Closing, Purchaser [Defendant GM] shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM].

(b) From and after the Closing, Purchaser [Defendant GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] . . . (ii) Lemon Laws.

11.    Plaintiff does not concede that New GM did not assume Old GM's liabilities for punitive damages. But, as that question is sure to be taken up in ongoing and protracted litigation and on appeal, in this action, Plaintiff is only seeking punitive damages for the conduct of New GM after July 2009.

12.    Moreover, the Bankruptcy Court order approving the Agreement made clear that New GM assumed "the warranty and recall obligations of both Old GM and [New GM]."

13.    Pursuant to the Agreement and other orders of the Bankruptcy Court, New GM emerged out of bankruptcy and continued the business of Old GM with many, if not most, of Old GM's employees and, on information and belief, with most of the same senior-level management, officers, and directors, and acquired all of Old GM's know-how, documents, data, files, and tests.

14.    The allegations pertaining to Old GM are included for purposes of background and context, and to set forth the scope of New GM's liabilities and responsibilities under the Agreement. This Complaint does not assert any causes of action against Old GM; all causes of action and attributions of liability are directed solely against New GM.

**JURISDICTION AND VENUE**

15.     Jurisdiction is proper in this Court pursuant to Case Management Order No. 8 in *In re General Motors LLC Ignition Switch Litigation*, [14-MC-2543, Dkt. No. 36]. By filing this Complaint in this District, however, Plaintiff does not waive the right to transfer this case to any other appropriate district at the conclusion of pretrial proceedings.

16.     Pursuant to the Court's instructions that plaintiffs may file directly in the MDL court and reserve the right to have filed in another district, this Complaint is filed by Plaintiff as if filed in the district where the accident occurred.

17.     This Court also has jurisdiction over this matter under 28 U.S.C. § 1332(a) because of the complete diversity of the parties' citizenship, and the amount in controversy exceeds $75,000.00.

## FACTS COMMON TO ALL CLAIMS

A. *Facts Regarding Subject Accident and Vehicle*

18.     On or about May 9, 2015, Plaintiff William Dillard was driving the Subject Vehicle and was involved in a frontal collision in Waveland, Mississippi. Plaintiff's airbags did not deploy during the collision and he sustained serious injuries (hereinafter, the "Subject Accident").

19.     On April 10, 2014, Defendant New GM issued a recall on the Subject Vehicle (NHTSA Recall No. 14V047000) stating that if the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury.

(The design of the ignition switch, position of the key lock module, and slot design of the key are collectively referred to herein as the "Key System.").

20.     The Subject Vehicle has the following safety-related design defects:

    a. First, the Key System can turn from the "run" position to the "accessory/off" position while the vehicle is running due to insufficient torque within the ignition switch to keep the detent plunger component in position.  When the key turns in

this manner, the engine and power steering shut off, the airbags and other passive restraints are deactivated, and the braking power and function are greatly reduced, often resulting in a loss of control and a collision.

b. Second, because of the low position of the Key System on the steering column, a driver can inadvertently bump the key fob or chain which results in the key turning from the "run" position to the "accessory/off" position.

c. Third, the key sold with these vehicles has a slot design that allows the key fob or chain to hang lower on the key and increases the chance of the key inadvertently moving from the "run" position to the "accessory/off" position.

d. Fourth, the Subject Vehicle contains a uniformly designed airbag system that is disabled when the ignition switch on the vehicle fails during ordinary and foreseeable driving situations. Thus, as a result of the defective design of the Subject Vehicle, a driver whose ignition switch fails may suddenly and without warning experience a vehicular power failure that also disables the vehicle's airbags, steering, and brakes. Such a failure may occur unexpectedly and during normal operation of the vehicle.

21.     As a direct and proximate result of the unreasonably dangerous and defective nature of the Subject Vehicle and the Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, testing, warning, inspection, servicing, and sale of the Subject Vehicle, Plaintiff sustained serious injuries, *including, but not limited to*, severe blunt force trauma. As a direct and proximate result of these injuries, Plaintiff incurred medical expenses; endured and pain and suffering; and loss of enjoyment of life. Plaintiff has otherwise suffered personal and pecuniary damages.

B.   *History of Defective General Motors' Key System*

22.     In 2001, during developmental testing of the 2003 Saturn Ion, Old GM learned that the engines in those cars were stalling due to defects in the Key System.  After the Sale Agreement, New GM gained this knowledge.

23.     New GM chose not to fix those defects.

6

24.      In 2002, Old GM began manufacturing and selling 2003 Saturn Ions with the defective Key System.  GM later sold other vehicles with the same defective Key System.  After the Sale Agreement, New GM gained this knowledge.

25.      In 2004, Old GM engineers reported that a driver's knee could easily bump a key and turn off the engine because the Saturn Ion's ignition switch was weak and was located low on the steering column.  After the Sale Agreement, New GM gained this knowledge.

26.      In January 2004, an Old GM engineer participating in the company's vehicle evaluation program concluded that "[t]his is a basic design flaw and should be corrected if we want repeat sales."  After the Sale Agreement, New GM gained this knowledge.

27.      In 2004, Old GM began installing the Key System used in the 2003 Saturn Ion in several other GM models.  After the Sale Agreement, New GM gained this knowledge.

28.      On October 29, 2004, Gary Altman, Old GM's program-engineering manager for the Cobalt, test drove a 2005 Cobalt with a standard key and key fob.  During the test drive, Altman's knee bumped the key, and the engine turned off which caused the vehicle to stall.  Altman reported this incident to Old GM.  After the Sale Agreement, New GM gained this knowledge.

29.      In response to Altman's report, Old GM launched an engineering inquiry to investigate the potential for the key to move from the "run" position to the "accessory/off" position during ordinary driving.  This inquiry is known within GM as a "Problem Resolution Tracking System Inquiry" ("PRTS").  The specific complaint which resulted in the PRTS was that "the vehicle can be keyed off with knee while driving."  After the Sale Agreement, New GM gained this knowledge.

30.      On February 1, 2005, as part of the PRTS, Old GM engineers concluded:

There are two main reasons that we believe can cause a lower effort in turning the key: 1. A low torque detent in the ignition switch. 2. A low position of the lock module in the column. (PRTS – Complete Report N172404).

After the Sale Agreement, New GM gained this knowledge.

31.    As part of the PRTS, Old GM engineers also began looking into ways to solve the problem of the key moving from the "run" to the "accessory/off" position during ordinary driving. After the Sale Agreement, New GM gained this knowledge.

32.    On February 18, 2005, Old GM engineers presented several possible solutions to the Cockpit Program Integration Team ("CPIT"). Old GM engineers determined the only "sure solution" to fixing the problem of the key inadvertently moving from the "run" position to the "accessory/off" position required changing the design from a low mount to a high mount lock module, which would considerably reduce the possibility of the key/key fob being impacted by a driver. After the Sale Agreement, New GM gained this knowledge.

33.    According to Old GM engineers, this change in the key position on the lock module, combined with increasing the detent in the ignition switch, would be a "sure solution." Despite this, Old GM, through Altman, rejected this "sure solution" in part because the cost to implement the system would be too high. After the Sale Agreement, New GM gained this knowledge.

34.    During this PRTS, Old GM also considered changing the key from a slot to a hole as a way to attempt to contain this problem, but not as a solution to the problem. After the Sale Agreement, New GM gained this knowledge.

35.    Changing the key from a slot to a hole would reduce the lever arm of the key and the key chain. With the slot design, the key chain would hang lower on the key, which would

increase the torque force on the ignition switch when the chain was contacted or moved in any way.

36.    An Old GM engineer conducted a cost analysis of this key change and determined that the cost to make this change would be less than one dollar per vehicle, or approximately 57 cents per part.  After the Sale Agreement, New GM gained this knowledge.

37.    Old GM rejected this proposed key change and, on March 9, 2005, Old GM closed the PRTS without taking any steps to fix the defective Key System in Old GM vehicles.  The PRTS detailed the reasons why Old GM took no action:

> Per GMX001 PEM's [Gary Altman] directive we are closing this PRTS with no action.  The main reasons are as follows:  All possible solutions were presented to CPIT and VAPIR:  a. The lead-time for all the solutions is too long.  b. The tooling cost and piece price are too high.  c. None of the solutions seem to fully countermeasure the possibility of the key being turned (ignition turn off) during testing.  Thus, none of the solutions represents an acceptable business case.

After the Sale Agreement, New GM gained this knowledge.

38.    On February 28, 2005, Old GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits.  After the Sale Agreement, New GM gained this knowledge.

39.    In the February 28, 2005 bulletin, Old GM provided the following recommendations/instructions to its dealers, but not to the Plaintiff in this case:

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.  The concern is more likely to occur if the driver is short and has a large heavy key chain.

> In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning.  The steering column was adjusted all the way down.  This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.

In cases that fit this profile, question the customer thoroughly to determine if this may be the cause. The customer should be advised of this potential and take steps, such as removing unessential items from their key chains, to prevent it.

Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

After the Sale Agreement, New GM gained this knowledge.

40.   However, at that time, Old GM knew that the inadvertent turning off of the ignition in the vehicles was due to design defects in the Key System in those vehicles, including the vehicles involved in this case, and was **not** limited to short drivers using large, heavy key chains. After the Sale Agreement, New GM gained this knowledge.

41.   Old GM failed to disclose and, in fact, concealed the February 28, 2005 bulletin and/or the information contained therein from Chevrolet owners, including the Plaintiff, and sent affirmative representations to dealers that did not accurately describe the nature of the problem, the multiple design steps needed for a "sure solution" to the problem, and Old GM's knowledge of it. After the Sale Agreement, New GM gained this knowledge and continued to conceal this information.

42.   Indeed, rather than disclosing this serious safety problem that uniformly affected many models of GM vehicles, Old GM concealed and obscured the problems, electing to wait until customers brought their cars to a dealership after an engine-stalling incident. Old GM offered its own dealers only an incomplete, incorrect and insufficient description of the defects and the manner in which to actually remedy them. After the Sale Agreement, New GM gained this knowledge and continued to conceal this information from Plaintiff and its own dealers.

43.     As of February 2005, Old GM engineers knew that the Saturn Ion and Chevrolet Cobalt vehicles had the Key System safety-related defects discussed in this Petition.  After the Sale Agreement, New GM gained this knowledge.

44.     Pursuant to 49 C.F.R. § 573.6, an automobile manufacturer must "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety."  Therefore, Old GM had a duty to disclose the known safety-related defects no later than February 2005.  As New GM gained the knowledge of Old GM, New GM had a duty to furnish this report in 2009.

45.     Instead of complying with its legal obligations, Old GM fraudulently concealed the Key System defect from the public, including the Plaintiff, and continued to manufacture and sell defective and unreasonably dangerous vehicles with known safety defects, causing Plaintiff to purchase or keep vehicles that contain a defective and dangerous Key System.  After the Sale Agreement, New GM gained this knowledge and continued the fraudulent concealment.

46.     In March 2005, after receiving a customer complaint that his/her Cobalt vehicle ignition turned off which driving, Old GM opened another PRTS – Complete Report (0793/2005-US).  The brand quality manager for the Cobalt, Steve Oakley, originated the PRTS.  As part of the PRTS, Mr. Oakley reviewed an email dated March 9, 2005 from Jack Weber, an Old GM engineer.  The subject of the email was "Cobalt SS Ignition Turn Off."  In the email, Mr. Weber stated:

> I've had a chance to drive a Cobalt SS and attempt to turn off the ignition during heel/toe down shifting.  Much to my surprise the first time I turned off the ignition switch was during a normal traffic brake application on I-96.  After that I was able to do a static reproduction of the conditions in the parking lot.  I've attached photos of the condition with comments.  My Anthropometric Measurements are attached below:
>
> Static view of keys, fob and registration hitting knee.

Post of RKE fob during normal driving.  Dynamic evaluation.

View of steering column cover and Pass Key 3+ "lump" under the key slot.

Key in run position, knee contacting the fob and the split ring is pulling on the key to move it to the "off" position.  Static evaluation.

Fob has levered around the steering column cover and turned the ignition off.

Unobstructed view of the fob and the column cover.

Attached below is documentation of a RAMSIS study performed to attempt to duplicate the real world condition.

Please call (586) 986-0622 with questions.

Jack Weber

After the Sale Agreement, New GM gained this knowledge.

47.     Mr. Weber clearly identified the defects in the Key System while he was driving the Cobalt.  After the Sale Agreement, New GM gained this knowledge.

48.     Despite clear evidence of the safety-related defect with the Key System, during the March 2005 PRTS, Old GM engineers decided not to reconsider any of the proposed solutions discussed during the February 2005 PRTS.  Instead, the Old GM engineers leading the PRTS recommended that sole corrective action Old GM should recommend would be to advise customers to remove excess material from their key rings, even though Old GM knew that the inadvertent turning off the ignition in these vehicles was due to design defects in the Key System in those vehicles, and was not limited to drivers having excess key ring materials.  After the Sale Agreement, New GM gained this knowledge and continued to give customers, including Plaintiff, this same misinformation.

49.     In May 2005, following receipt of another customer complaint that his/her Cobalt vehicle ignition turned off while driving, Old GM opened another PRTS. After the Sale Agreement, New GM gained this knowledge.

50.     During the May 2005 PRTS, Old GM decided to redesign the key in order to reduce the possibility that a driver may inadvertently turn the key from the "run" position to the "accessory/off" position during ordinary driving. After the Sale Agreement, New GM gained this knowledge.

51.     Despite this initial safety/redesign commitment, Old GM ultimately failed to follow through on its own decision and closed this PRTS without any action, further concealing what it knew from the public and continuing to subject the public, including the Plaintiff, to the defective vehicles' serious safety risks. After the Sale Agreement, New GM gained this knowledge and continued to conceal this information.

52.     At or about this same time, Old GM's Manager of Product Safety Communications, Alan Adler, issued the following statement with respect to the Chevrolet Cobalt's inadvertent shut-off problems, affirmatively representing in its "Statement on Chevrolet Cobalt Inadvertent Shut-offs" that:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running.
>
> When this happens, the Cobalt is still controllable.  The engine can be restarted after shifting to neutral.
>
> GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid factors such as steering column position, seat height and placement.  Depending on these factors, a driver can unintentionally turn the vehicle off.

Service advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing non-essential material from their key rings.

Ignition systems are designed to have "on" and "off" positions, and practically any vehicles can have power to a running engine cut off by inadvertently bumping the ignition from the run to accessory or off position.

After the Sale Agreement, New GM gained this knowledge.

53.    This statement is demonstrably false and misleading and New GM failed to take any action to correct it and to inform the public, including Plaintiff of this information.

54.    Contrary to Old GM's above-referenced statement, Old GM's internal testing documents showed that these incidents occurred when drivers were using keys with the standard key fob. Old GM knew that these incidents were not caused by heavy key chains or a driver's size and seating position. Old GM knew that removing the non-essential material from key rings would not "virtually eliminate" the possibility of inadvertent bumping the key from the "run" position to the "accessory/off" position while the car is running. After the Sale Agreement, New GM gained this knowledge.

55.    Old GM's above-referenced statement was further demonstrably false and misleading because Old GM knew that these incidents were ultimately caused by the safety-related defects in the Key System identified in the February 2005 PRTS. After the Sale Agreement, New GM gained this knowledge.

56.    On July 29, 2005, Amber Marie Rose, a sixteen-year-old Clinton, Maryland resident, was driving a 2005 Cobalt when she drove off the road and struck a tree head-on. Amber's driver's side frontal airbag did not deploy and she died as a result of the injuries she sustained in the crash. After the Sale Agreement, New GM gained this knowledge.

57.    Old GM received notice of Amber's incident in September 2005 and opened an internal investigation file pertaining to this incident shortly thereafter. After the Sale Agreement, New GM gained this knowledge.

58.    During its investigation of the incident, Old GM learned that the key in Amber's Cobalt was in the "accessory/off" position at the time of the crash.  Old GM also learned that the driver's side front airbag should have deployed given the circumstance of the crash.  Upon information and belief, Old GM subsequently entered into a confidential settlement agreement with Amber's mother. After the Sale Agreement, New GM gained this knowledge.

59.    In December 2005, shortly after commencing an internal investigation into the Amber Rose incident, Old GM issued a Technical Service Bulletin ("TSB") (05-02-35-007). After the Sale Agreement, New GM gained this knowledge.

60.    The TSB provided "Information on the inadvertent turning of key cylinder, loss of Electric System, and no DTCs" with the following service information:

> There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effect.

> The concern is more likely to occur if the driver is short and has a large and/or heavy key chain.  In these cases, this condition was documents and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down.  This is more likely to happen to a person who is short, as they have the seat positioned closer to the steering column.

> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause.  The customer should be advised of this potential and should take steps to prevent it – such as removing unessential items from their key chain.

> Engineering has come up with an insert for the key ring so that it goes from a "slot" design to a hole design.  As a result, the key ring cannot move up and down in the slot any longer – it can only rotate on the hole.  In addition, the previous key ring has been replaced with a smaller, 13 mm (0.5 in) design.  This will result in the keys not hanging as low as in the past.

After the Sale Agreement, New GM gained this knowledge.

61.    Again, the information that Old GM gave in this TSB was also false and misleading. After the Sale Agreement, New GM gained this knowledge and did nothing to correct the false and misleading information.

62.    In the two PRTSs Old GM issued before it issued the TSB, Old GM engineers never represented that short drivers or heavy key chains were the reasons why those incidents were happening.  After the Sale Agreement, New GM gained this knowledge.

63.    Indeed, at the time it issued the TSB, Old GM knew that these incidents were happening to drivers of all sizes using keys with the standard key fobs.  Old GM knew that these incidents were not caused by short drivers with heavy chains, but were caused by the safety-related defects in the Key System of its defective vehicles, including Plaintiff's vehicle.  After the Sale Agreement, New GM gained this knowledge.

64.    In 2005, Old GM began buying back Cobalts from certain customers who were experiencing engine stalling incidents. Old GM never told the public, including Plaintiff, that it was buying back Cobalts under those circumstances.  Old GM refused to buy back Cobalts from other customers who had also experienced engine stalling incidents. In fact, for many of the customers who complained about experiencing engine-stalling incidents, Old GM never informed these customers of the TSB and/or the availability of the key insert. After the Sale Agreement, New GM gained this knowledge and continued this same conduct.

65.    Shortly after Amber Rose's death, there was another incident on November 17, 2005, involving a 2005 Cobalt in Baldwin, Louisiana. In that incident, the Cobalt went off the road and hit a tree. The frontal airbags did not deploy in this accident. GM received notice of the

accident, opened a file, and referred to it as the Cobalt incident. After the Sale Agreement, New GM gained this knowledge.

66.     On February 10, 2006, in Lanexa, Virginia, shortly after Old GM issued the TSB, a 2005 Cobalt drove off the road and hit a light pole. The frontal airbags failed to deploy in this incident. The download of the SDM (commonly referred to as the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident. After the Sale Agreement, New GM gained this knowledge.

67.     On March 14, 2006, in Fredrick, Maryland, a 2005 Cobalt travelled off the road and struck a utility pole. The frontal airbags did not deploy in this incident. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this incident, opened a file, and referred to it as the "Oakley incident." After the Sale Agreement, New GM gained this knowledge.

68.     On August 1, 2006, after receiving a customer complaint about a Cobalt stalling while driving, Old GM opened another PRTS relating to the issue. Old GM closed this PRTS on October 2, 2006 without taking any action. After the Sale Agreement, New GM gained this knowledge and failed to take any corrective action.

69.     In October 2006, Old GM updated the TSB (05-02-35-007) to include additional model years: the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt and 2007 Pontiac Solstice and G5. These vehicles have the same safety-related defects in the Key System as the vehicles in the original TSB. All of the vehicles identified in the original TSB and updated TSB are hereinafter referred to as the "Defective Vehicles." After the Sale Agreement, New GM gained this knowledge.

17

70.     On December 29, 2006, in Sellersville, Pennsylvania, a 2005 Cobalt drove off the road and hit a tree.  The frontal airbags failed to deploy in this incident.  Old GM received notice of this incident, opened a file and referred to it as the "Frei" incident.  After the Sale Agreement, New GM gained this knowledge.

71.     On February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt drove off the road and hit a truck.  The frontal airbags failed to deploy in this incident.  The download of the SDM showed that the key was in the "accessory/off" position.  Old GM received notice of this incident, opened a file and referred to it as the "White" incident.  After the Sale Agreement, New GM gained this knowledge.

72.     On August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck.  The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file and referred to it as the "McCormick" incident. After the Sale Agreement, New GM gained this knowledge.

73.     On September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost control and struck a guardrail. The frontal airbags failed to deploy in this incident. Old GM received notice of this incident, opened a file and referred to it as the "Gathe" incident. After the Sale Agreement, New GM gained this knowledge.

74.     On October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt drove off the road and hit a tree.  The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file and referred to it as the "Breen" incident. After the Sale Agreement, New GM gained this knowledge.

75.     On April 5, 2008, in Sommerville, Tennessee, a 2006 Cobalt drove off the road and struck a tree.  The frontal airbags failed to deploy. The download of the SDM showed the key was

in the "accessory/off" position.  Old GM received notice of this incident, opened a file and referred to it as the "Freeman" incident.  After the Sale Agreement, New GM gained this knowledge.

76.     On May 21, 2008 in Argyle, Wisconsin, a 2007 Pontiac G5 traveled of the road and struck a tree.  The frontal airbags failed to deploy.  The download of the SDM showed that the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file and referred to it as the "Wild" incident. After the Sale Agreement, New GM gained this knowledge.

77.     On May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and struck a tree.  The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file and referred to it as the "McDonald" incident. After the Sale Agreement, New GM gained this knowledge.

78.     On September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt traveled of the road and struck a tree. The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file and referred to it as the "Harding" incident. After the Sale Agreement, New GM gained this knowledge.

79.     On November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt traveled off the road and hit a tree.  The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file and referred to it as the "Dunn" incident. After the Sale Agreement, New GM gained this knowledge.

80.     On December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off the road and hit a utility pole.  The frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file and referred to it as the "Grondona" incident. After the Sale Agreement, New GM gained this knowledge.

81.     In February 2009, Old GM opened another PRTS with respect to the Defective Vehicles—this time to investigate why the key slot and the key in Cobalts allowed the key chain to hang too low in the vehicles, as well as the inadvertent shutting off of the vehicles. After the Sale Agreement, New GM gained this knowledge.

82.     Through this PRTS, Old GM determined that changing the key from a slot to a hole would significantly reduce the likelihood of inadvertent turning off the ignition switch. After the Sale Agreement, New GM gained this knowledge.

83.     In March 2009, Old GM approved of the design change in the key from a slot to a hole.  According to Old GM, this redesigned change was implemented in model year 2010 Cobalts. Old GM chose not to provide these redesigned keys to the owners or lessees of any of the vehicles included in the TSB. After the Sale Agreement, New GM gained this knowledge and continued to refuse to provide the redesigned keys to the owners or lessees of any of the vehicles included in the TSB.

84.     Throughout this entire time period, Old GM was selling the Defective Vehicles to consumers for full price, and consumers were purchasing them believing that the vehicles were non-defective, but all the while Old GM was concealing the extent and nature of the defects in the Defective Vehicles. After the Sale Agreement, New GM gained this knowledge and continued this concealment.

85.     In the section called "Safety," Old GM's Chevrolet website stated:

**OUR COMMITMENT**

Your family's safety is important to us.  Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe—from the start of your journey to your destination.  That's why every Chevrolet is designed with a comprehensive list of safety and security features to

help give you peace of mind. Choose from the safety features below to learn more about how they work, and which Chevy vehicles offer them.

After the Sale Agreement, New GM gained this knowledge.

86.    Similarly, Old GM promoted its Saturn vehicle line on television with statements including: "Putting people first," and "Saturn. People first." After the Sale Agreement, New GM gained this knowledge

87.    Saturn's print ad campaign featured advertisements like following, which stated, among other things: "Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars." After the Sale Agreement, New GM gained this knowledge.

88.    In order to increase sales, Old GM touted the safety of its vehicles; however, it did not disclose its knowledge of the dangerous Key System defects of to its customers, including Plaintiff. After the Sale Agreement, New GM gained this knowledge and continued to refuse to disclose the safety defects.

89.    In 2009, Old GM declared bankruptcy and, weeks later, it emerged from bankruptcy as General Motors LLC ("New GM"). Both before and after the bankruptcy, the Key Systems in the Defective Vehicles continued to fail and GM, in all iterations, continued to conceal the truth.

90.    On May 15, 2009, Old GM met with Continental AG, an airbag component supplier, and requested the Continental download SDM data from a 2006 Cobalt accident where the airbags failed to deploy. After the Sale Agreement, New GM gained this knowledge

91.    On December 31, 2010, in Rutherford County, Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off"

position. New GM received notice of this incident, opened a file and referred to it as the "Chansuthus" incident.

92.    On the same day in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. New GM received notice of this incident, opened a file and referred to it as the "Najera" incident.

93.    On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. New GM received notice of this incident, opened a file and referred to it as the "Sullivan" incident.

94.    In 2010, New GM began a formal investigation of the frontal airbag non-deployments in Chevrolet Cobalts and Pontiac G5s. New GM subsequently elevated the investigation to a Field Performance Evaluation ("FPE").

95.    In August 2011, New GM assigned Engineering Group Manager Brian Stouffer as the Field Performance Assessment Engineer ("FPAE") to assist with FPE investigation.

96.    In the spring of 2012, Stouffer asked Jim Federico, a high-level executive and chief engineer at New GM, to oversee the FPE investigation. Federico was the "executive champion" for the investigation to help coordinate resources for the FPE investigation.

97.    In May 2012, New GM engineers tested the torque on the ignition switches for the 2005-2009 Cobalts, 2007 and 2009 Pontiac G5s, 2006-2009 HHRs and 2003-2007 Saturn Ion vehicles in a junkyard.  The results of these tests showed that the torque required to turn the ignition switches in most of these vehicles, including in the 2008 and 2009 vehicles, from the "run" position to the "accessory/off" position did not meet New GM's minimum torque

specification requirements. These results were reported to Stouffer and other members of the Field Performance Evaluation team.

98.     In September 2012, Stouffer requested assistance from a "Red X Team" as part of the Field Performance Evaluation investigation. The Red X Team was a group of engineers within New GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s.  By that time, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective Key System.  The Red X Team became involved in the investigation shortly after Mr. Stouffer's request.

99.     During the Field Performance Evaluation process, New GM determined that increasing the detent in the ignition switch would not be a total solution to the problem, though it would reduce the chance that the key would inadvertently move from the "run" position to the "accessory/off" position.

100.     Indeed, New GM engineers identified several other ways to fix the problem.  Their ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the "run" position, and adding a push button to the lock cylinder to prevent it from slipping out of the "run" position.

101.     New GM rejected each of these ideas.

102.     The position of the key on the steering column and the key with the slot allow the key fob to hang too low off the steering column. New GM engineers understood that the key fob may be impacted and pinched between the driver's knee and the steering column which causes the key to inadvertently turn from the "run" position to the "accessory/off" position.

103.     New GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem.

104.    New GM concealed and continued to conceal from the public the nature and extent of the defects.

105.    In 2012, Federico, Stouffer, and the remaining members of the Red X Team knew that the Key System in the Ion, Cobalt, and G5 vehicles had safety-related defects that would cause the key to move from the "run" position to the "accessory/off" position while driving these vehicles.  New GM knew that when the key inadvertently moved, the airbags would no longer work in frontal crashes.

106.    Federico, Stouffer, and the other members of the Red X Team also understood that these safety-related defects caused or contributed to cause numerous accidents and multiple fatalities. Despite this knowledge, New GM chose to conceal this information from the public, NTHSA and the Plaintiff.

107.    Under 49 C.F.R. § 537.6, GM had a duty to disclose the safety-related defects in the Ion, Cobalt and G5 in 2012.  New GM did not comply with its legal obligations, and continued to fraudulently conceal these defects from the public and the U.S. government.

108.    Acting NHTSA Administrator David Friedman recently stated, "at least by 2012, New GM staff was very explicit about an unreasonable risk to safety" from the defective Key System.

109.    Mr. Friedman continued: "[New] GM engineers knew about the defect. [New]GM lawyers knew about the defect. But [New] GM did not act to protect Americans from the defect."

110.    There is significant evidence that New GM's multiple in-house attorneys knew of and understood the ignition switch defect in and around 2012 and 2013. These attorneys, including in-house lawyer Michael Milliken, negotiated settlement agreements with families whose loved ones had been killed and/or injured while operating a defective vehicle under circumstances that

implicated the ignition switch defect. In spite of their knowledge of the ignition switch defect, New GM's attorneys concealed what they knew and neglected to question whether the Key Systems should be recalled. This quest to keep the ignition switch defect secret prolonged its ultimate discovery and contributed to added death and injury.

111.    On April 29, 2013, Ray DeGiorgio was deposed in Detroit, Michigan as part of the lawsuit brought by Brooke Melton's parents. At his deposition, Mr. DeGiorgio was shown photographs of the differences between the ignition switch in Brooke's Cobalt and the ignition switch in the 2008 Cobalt (which DeGiorgio had redesigned without changing the part number).

112.    Mr. DeGiorgio was questioned about his knowledge of any differences in the ignition switches:

> Q. And I'll ask the same question. You were not aware before today that GM had changed the spring – the spring on the ignition switch had been changed from '05 to the replacement switch?
>
> MR. HOLLADAY: Object to the form. Lack of predicate and foundation. You can answer.
>
> THE WITNESS: I was not aware of a detent plunger switch change. We certainly did not approve a detent plunger design change.
>
> Q. Well, suppliers aren't supposed to make changes such as this without GM's approval, correct?
>
> A. That is correct.
>
> Q. And you are saying that no one at GM, as far as you know, was aware of this before today?
>
> MR. HOLLADAY: Object. Lack of predicate and foundation. You can answer.
>
> THE WITNESS: I am not aware about this change.

DeGiorgio Dep. at 151-152.

113.    Mr. DeGiorgio's testimony left no doubt that he unequivocally disclaimed any knowledge of any change in the ignition switch in the 2005–2010 Cobalts. Mr. DeGiorgio, however, authorized the redesign to the ignition switches in 2006. Thus, the testimony provided in 2013 was knowingly false and intended to mislead.

114.    As pressure from the Melton litigation mounted, New GM executives finally felt compelled to act. On January 31, 2014, New GM's Field Performance Review Committee and Executive Field Action Decision Committee ("EFADC") finally ordered a recall of some GM vehicles.

115.    On February 7, 2014, GM, in a letter from Director of Product Investigations and Safety Regulations, Carmen Benavides, informed NHTSA that it was conducting a recall of 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles.

116.    GM knew that this recall was insufficient in scope. Indeed, GM knew the same defective ignition switches installed in the Cobalt and G5 vehicles were installed in several other vehicles – including the Subject Vehicle – but GM did not recall these vehicles on February 7th.

117.    On February 19, 2014, a Request for Timeliness Query of GM's recall was sent to NHTSA by The Cooper Firm. The timeliness inquiry pointed out that GM had failed to recall all of the vehicles with the defective ignition switches, and asked NHTSA to investigate GM's failure to fulfill its legal obligation to report the safety defects in the affected vehicles within five days of discovering the defects—a requirement of applicable federal law.

118.    On February 24, 2014, GM informed NHTSA it was expanding the recall to include 2006–2007 model year Chevrolet HHR and Pontiac Solstice, 2003–2007 model year Saturn Ion, and 2007 model year Saturn Sky vehicles.

119.    The February 24th recall was again insufficient and failed to include the Subject Vehicle that suffered from the same or similar defective Key System.

120.    New GM included an Attachment to the February 24, 2014 letter. In the Attachment, GM, for the first time, admitted that it authorized a change in the ignition switch in 2006. Specifically, GM stated:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics. The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch. GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year.

121.    In a video message addressed to New GM employees on March 17, 2014, GM's Chief Executive Officer, Mary Barra, admitted that New GM made mistakes and needed to change its process.

122.    According to Ms. Barra, "[s]omething went terribly wrong in our process in this instance, and terrible things happened." Barra went on to promise that "GM will be better because of this tragic situation if we seize the opportunity."

123.    The public backlash continued and intensified. On March 28, 2014, New GM again expanded the ignition switch recall to cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky in the United States. This third expansion of the ignition switch recall covered an additional 824,000 vehicles in the United States and raised the number of recalled vehicles to 2,191,146.

124.    GM later terminated fifteen employees for their participation in the ignition switch cover-up. Two of those employees, Design Release Engineer Ray DeGiorgio and Gary Altman,

were intimately involved in the development and concealment of the defective ignition switches, and both were longtime employees of Old GM and New GM.New GM has been investigated by the National Highway Traffic Safety Administration.  As a result of that investigation, on May 16, 2014, GM and NHTSA entered into a Consent Order in which New GM agreed to a $35 million fine, the maximum which may be imposed by NHTSA, for failing to timely provide notice of the safety-related defect that is the subject of this lawsuit.

125.    New GM and its executive leadership was the subject of several hearings before subcommittees of both the United States Senate and the House of Representatives.

126.    New GM was the subject of a year-long investigation by the United States Department of Justice, which resulted in a $900 million fine and a deferred prosecution agreement for criminal charges, including wire fraud.

127.    GM has acknowledged that the ignition switch defect has caused at least thirteen deaths and over 50 accidents. Independent safety groups put this number far higher. The Center for Auto Safety, for example, estimates that there have been 303 deaths associated with the Saturn Ion and Chevrolet Cobalt vehicles alone. The actual number of deaths and accidents for all Subject Vehicle models is expected to be significantly higher than GM's estimate.

128.    In April 2014, under intense scrutiny from Congress and the Department of Justice, Mary Barra announced that GM would retain attorney Kenneth Feinberg to implement a claims facility to amicably resolve personal injury and wrongful death claims associated with the ignition switch defect.

129.    However, New GM continues to refuse acknowledgment that GM's engineers have long known-the defect in its Key System was not limited to inadequate torque performance, but also includes the low placement of the ignition on the steering cylinder as well as the airbag system

28

that is disabled when the ignition is in the "accessory" or "off" position. New GM's FPE team recognized these essential aspects of the safety defect as recently as 2012 when they proposed placing a shroud over the ignition and/or moving the ignition higher on the steering column.

130.    Even if the ignition switch defect were purely an issue of inadequate torque performance, however, the evidence shows that the ignition switches were defective even after DeGiorgio's 2006 redesign. In May of 2012, New GM's FPE team tested the ignition switches in dozens of affected vehicles, many of them model years 2008 and 2009. In these tests, GM engineers found that the ignition switches for these 2008 and 2009 model year affected vehicles by and large failed to meet GM's torque specifications for the ignition switch.

131.    Further, New GM's own investigation into airbag non-deployment events in Chevrolet Cobalt vehicles identified over 250 non-deploy crashes involving 2008-2010 Cobalts. Upon information and belief, GM has knowledge of numerous non-deploy incidents in affected vehicles of model year 2008 and later in which the ignition switch was not replaced prior to the relevant incident. Although these vehicles have thus exhibited evidence of the ignition switch defect, they were not eligible for compensation from the Claims Facility.

132.    In truth, the problems in earlier model year vehicles and later model year vehicles are the same. The ignitions are placed dangerously low on the steering column and the torque required to hold the ignition key in place under normal driving conditions is insufficient. These problems existed in the Subject Vehicle and were the cause of Plaintiff's injuries as the airbag failed to deploy in frontal collision.

## COUNT I – STRICT LIABILITY

133.    Plaintiff hereby incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein.

134.    As set forth above, pursuant to the Agreement, New GM assumed the liabilities associated with the defective and dangerous Subject Vehicle, *including, but not limited to*, its Key System.

135.    New GM researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, marketed and/or introduced into the stream of commerce the Subject Vehicle in the ordinary course of its business.

136.    At the time the Subject Vehicle left New GM's control, it was defective and unreasonably dangerous in several respects, *including, but not limited to*, the following:

    a.  The Key System had a propensity to turn from the "run" position to the "accessory/off" position while the vehicle is running, which caused the vehicle to enter a stall and experience a sudden loss of power steering; power brakes; and, caused a failure of the airbag and restraint system;

    b.  The position of the key lock module on the steering column allowed a driver to inadvertently bump the key fob or chain, resulting in the key turning from the "run" position to the "accessory/off" position, which caused the vehicle to enter a stall and experience a sudden loss of power steering; power brakes; and, caused a failure of the airbag and restraint system;

    c.  The key's design allowed the key fob or chain to hang lower on the key, which increases the chance of the key inadvertently moving from the "run" position to the "accessory/off" position, which caused the vehicle to enter a stall and experience a sudden loss of power steering; power brakes; and, caused a failure of the airbag and restraint system;

    d.  Subject Vehicle contains a uniformly designed airbag system that is disabled when the ignition switch on the vehicle fails during ordinary and foreseeable driving situations. Thus, as a result of the defective design of the Subject Vehicle, a driver whose ignition switch fails may suddenly and without warning experience a vehicular power failure that also disables the vehicle's airbags, steering, and brakes. Such a failure may occur unexpectedly and during normal operation of the vehicle;

    e.  The Key System and its associated component parts lacked adequate testing and/or inspection before it was distributed and sold to ensure it was reasonably suitable for its intended purpose; and,

      f.   The Key System and its associated component parts lacked adequate warnings and/or other proper notice to alert users regarding the hazardous condition, as herein described, involving its use and operation.

137.    After the Sale Agreement, New GM gained the knowledge relating to the defective and dangerous Key System in the Subject Vehicle.

138.    The Subject Vehicle was expected to and did reach the hands of the consumer, including Plaintiff, without substantial change or modification and was in substantially the same condition on the day of the subject collision as it was in when it left the possession and control of New GM.

139.    Furthermore, the Subject Vehicle was in a defective and unreasonably dangerous condition in that it failed to give Plaintiff fair and adequate notice of the danger and possible consequences of using the Subject Vehicle in the intended and appropriate manner.

140.    The Subject Vehicle was used by its owners, lessees, drivers, and passengers in a manner that could be reasonably anticipated.

141.    As a direct result of the unreasonably dangerous and defective nature of the Subject Vehicle's Key System, Plaintiff was unable to maintain control of the vehicle and the Subject Vehicle's airbag and other restraint systems failed to activate during a reasonable foreseeable accident, which caused serious injuries and damages set forth herein.

## <u>COUNT II - NEGLIGENCE</u>

142.    Plaintiff hereby incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

143.    As part of the sale of Old GM, New GM agreed to accept liability of vehicles designed and manufactured by Old GM, *including, but not limited to*, the Subject Vehicle.

144.    Prior to the Subject Accident, in the regular course of its business, New GM marketed and distributed for sale the Subject Vehicle.

145.    New GM had a duty to exercise reasonable care in designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, and/or distributing the Subject Vehicle into the stream of commerce.

146.    New GM was negligent and failed to exercise ordinary care or breach its duty of care to Plaintiff in several respects, *including, but not limited to*, the following:

   a.    Designing and manufacturing the Key System in the Subject Vehicle such that it can turn from the "run" position to the "accessory/off" position while the vehicle is running;

   b.    Designing and manufacturing the key lock module such that its position of the on the steering column allows a driver to inadvertently bump the key fob or chain which results in the key turning from the "run" position to the "accessory/off" position;

   c.    Designing and manufacturing the key for its vehicles with a slot design that allows the key fob or chain to hang lower on the key and increases the chance of the key inadvertently moving from the "run" position to the "accessory/off" position;

   d.    Designing and manufacturing the Subject Vehicle that contains a uniformly designed airbag system that is disabled when the ignition switch on the vehicle fails during ordinary and foreseeable driving situations. Thus, as a result of the defective design of the Subject Vehicle, a driver whose ignition switch fails may suddenly and without warning experience a vehicular power failure that also disables the vehicle's airbags, steering, and brakes. Such a failure may occur unexpectedly and during normal operation of the vehicle;

   e.    Failing to provide owners and lessees with an adequate warning regarding the risks of the aforementioned design and manufacturing defects; and,

   f.    Failing to proper test and/or inspect the Key System in the Subject Vehicle to ensure that it adequately performed during reasonably foreseeable operation.

147.    As a direct and proximate result of the aforementioned negligent acts and/or omissions of Defendant New GM, Plaintiff was unable to maintain control of the Subject Vehicle

and the airbag and other restraint systems failed to activate during a reasonably foreseeable accident, which caused serious injuries and damages set forth herein.

## COUNT III – BREACH OF IMPLIED WARRANTY

148.    Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

149.    As part of the sale of Old GM, New GM agreed to accept liability of vehicles designed and manufactured by Old GM, *including, but not limited to*, the Subject Vehicle.

150.    Prior to and on the date of the subject collision, the Subject Vehicle was used as a consumer good—*i.e.,* primarily for personal, family or household purposes

151.    In order to induce the purchase or lease of GM products, New GM impliedly warranted to potential drivers and passengers of GM vehicles, including Plaintiff, that the Subject Vehicle was merchantable, safely tested and manufactured, and was safe for the uses for which it was designed and manufactured.

152.    New GM breached its implied warranty of merchantability by selling the Subject Vehicle when it was not fit for the ordinary purpose for which such goods are sold.

153.    Plaintiff relied on New GM's implied warranty of merchantability.

154.    This breach directly and proximately caused the serious injuries and damages sustained by Plaintiff, as set forth herein.

## COUNT IV - FRAUDULENT MISREPRESENTATION/FRAUDULENT CONCEALMENT

155.    Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

156.    After the sale of Old GM to New GM, in which New GM agreed to accept liability of vehicle designed and manufactured by Old GM, New GM continued to misrepresent and fraudulently conceal the defects in the Subject Vehicle. Count IV of Plaintiff's Complaint is intended to represent an independent claim against New GM for New GM's actions and conduct.

157.    New GM made material representation to Plaintiff that the Subject Vehicle was safe for its ordinary and intended use.

158.    As set forth in more detail above, New GM's representations as to the safety of the Subject Vehicle and its Key System were false.

159.    New GM knew that its and Old GM's representations as to the safety of the Subject Vehicle and its Key System were false.

160.    New GM intended that its representations as to the safety of the Subject Vehicle and its Key System would be heard by consumers, including Plaintiff.

161.    Plaintiff was ignorant of the falsity of Old and New GM's representations as to the safety of the Subject Vehicle and its Key System.

162.    Plaintiff materially relied on Old and New GM's representations as to the safety of its vehicles in deciding to purchase/lease the Subject Vehicle and to the continued use of the Subject Vehicle after New GM purchased Old GM.

163.    Plaintiff had the right to rely on the truthfulness of New GM's representations as to the safety of the Subject Vehicle.

164.    The safety-related defects in the Subject Vehicle were not within the fair and reasonable reach of Plaintiff, in that design, manufacturing, and testing information relevant to the safety-related defects was within the exclusive control of GM and could not be discovered by Plaintiff through the exercise of due diligence.

165.    Plaintiff was unable to discover the concealed information, despite exercising due diligence in the selection of a vehicle to purchase or lease.

166.    As a direct and proximate result of New GM's fraudulent actions, Plaintiff was seriously injured and damaged as set forth herein.

## DAMAGES

167.    As a direct and proximate result of New GM's wrongful conduct, Plaintiff has been (and continues to be) damaged in the form of: (a) past and future pain and suffering; (b) past and future physical impairment; (c) past and future physical disfigurement; (d) past and future mental anguish; (e) past and future loss of consortium and/or loss of services; (f) past and future loss of income and/or lost earning capacity; (g) past and future reasonable and necessary medical expenses; and (h) past and future loss of enjoyment of life (i) loss of function; (j) prospective medical care and medication costs; and (k) property damage to Plaintiff's vehicle sustained in the crash. All of the damages sustained by Plaintiff was reasonably foreseeable by New GM, and exceed the minimum jurisdictional limits of this Court. All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

## PUNITIVE DAMAGES

168.    The evidence referenced in this Complaint and the mounting evidence regarding the recent recalls of millions of defective GM vehicles makes it clear that New GM is guilty of exceptional misconduct. New GM was issued, and agreed to, a record fine by the U.S. Department of Transportation's National Highway Traffic Safety Administration. New GM has been aware for more than a dozen years that the ignition switches in the affected vehicles were grossly inadequate and subjected the driving public to a grave risk of grievous harm. Producing and marketing vehicles that are subject to complete system failures at highway speeds is akin to launching

millions of torpedoes onto American streets and highways – with unsuspecting consumers inside. New GM knew about the problem for years and, because of greed and/or gross ineptitude, refused to act on the problem. Instead, New GM gave the issue the "GM nod." The "GM nod" demonstrates that more than one of New GM's superior officers in the course of employment ordered, ratified, and/or participated in the malicious conduct. These officers acted maliciously, wantonly, and/or recklessly, and clearly New GM is guilty of exceptional misconduct and gross negligence. Plaintiff demands punitive damages for this conduct.

169.    Plaintiff will further show that the clear and convincing evidence in this case establishes that New GM consciously or deliberately engaged in oppression, fraud, wantonness, and/or malice in concealing the defect in the Subject Vehicle and failing to recall the vehicle in a timely manner. New GM had actual, subjective awareness of the risk involved but nevertheless proceeded with indifference to the rights, safety, or welfare of others, including Plaintiff. Therefore, punitive damages are sought and should be assessed against New GM. Plaintiff does not, in this action seek punitive damages for the conduct of Old GM, but does not concede that New GM did not also assume liability for punitive damages.

170.    Plaintiffs are entitled to punitive and/or exemplary damages. Defendant New GM has demonstrated malice and gross negligence through their conscious indifference to the rights, health, safety, and welfare of Plaintiff. Therefore, Plaintiff sues Defendant New GM for exemplary damages in an amount sufficient to deter such conduct from ever occurring again.

### PRE- AND POST-JUDGMENT INTEREST

171.    Lastly, Plaintiff is entitled to pre-judgment and post-judgment interest (to be determined).

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on any and all issues in this action so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant as follows:

    a.  an award to Plaintiff for actual and compensatory damages, punitive damages, including interest, in an amount to be proven at trial;

    b.  an award of costs, as allowed by law;

    c.  an award of pre-judgment and post-judgment interest, as provided by law;

    d.  leave to amend this Complaint to conform to evidence produced at trial; and

    e.  such other relief as may be appropriate under the circumstances.

Dated: May 8, 2018

                    Respectfully submitted,

                    /s/Brett A. Emison____
                    Brett A. Emison
                    LANGDON & EMISON
                    911 Main Street, P.O. Box 220
                    Lexington, Missouri 64067
                    (660) 259-6175
                    (660) 259-4571 FAX
                    brett@lelaw.com
                    *Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of May, 2018, I electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

                    /s/Brett A. Emison_____